

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-08-179-CV**

IN THE INTEREST OF J.L.W.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In two issues, Appellant Diane R. (hereinafter "Mother") appeals the termination of her parental rights to J.L.W.  We affirm.

### II. Factual and Procedural History

---

[1] *See* Tex. R. App. P. 47.4.

J.L.W., a mentally-retarded special needs child, was born to Mother in 2003.[2] Mother has four children: B., a ten-year-old girl; A., a nine-year-old girl; J.L.W., a four-year-old boy; and D., a three-year-old girl. A., B., and J.L.W. each have different fathers. Mother does not have legal custody of any of her children.

Prior to J.L.W.'s removal, Mother, who is also mentally retarded,[3] already had a significant history with Child Protective Services (CPS) involving abuse directed at her and her older daughters, A. and B., by Mother's boyfriends. J.L.W.'s alleged biological father, J.J.W., was convicted of assaulting Mother in 2003,[4] and A.'s father beat both B. and Mother.

CPS's first referral involving J.L.W. occurred in October 2004, but the events that directly led to the termination of Mother's parental rights to J.L.W. occurred in March 2007. CPS had already begun an investigation of negligent

_____

[2] J.L.W. has West Syndrome, which involves three separate disorders: seizure disorder, developmental delay, and mental retardation. By age four, J.L.W. could walk, but he could not speak or feed himself, he was not potty-trained, and he operated at a six-month-old level. J.L.W. takes medication and receives physical therapy and speech therapy.

[3] Mother receives services from MHMR and Adult Protective Services (APS) from time to time. She receives SSI because of her disability. The MHMR trust fund pays Mother's rent, water bill, and light bill.

[4] J.J.W.'s parental rights to J.L.W. were also terminated below, but J.J.W. does not appeal.

supervision and physical abuse when it received information about an attack on Mother by her live-in boyfriend, P.J.[5]

Fort Worth Police Officer Eric Stahura testified about an assault by P.J. on Mother on March 23, 2007, and a second assault the following day. He testified that Mother called the police on March 24, told them that she had been assaulted the night before, and told them "that she wanted to go to her apartment and get her belongings and her child." She informed the police that she and P.J. had gotten into an argument when he accused her of cheating on him and that he choked her until she became unconscious. When she regained consciousness, she bolted, leaving J.L.W. alone with P.J. Officer Stahura testified that Mother said that she did not want to press charges but that she needed an escort because she was scared of P.J.

Mother gave substantially the same testimony. She testified, "I went unconscious and I woke up and my baby [J.L.W.] was standing over me." She

---

[5] CPS ruled out an earlier referral for physical abuse and physical neglect with regard to Mother appropriately medicating J.L.W. The negligent supervision and physical abuse referral involved facts alleging that P.J. had been tying J.L.W. to the bed with bed sheets and that P.J. was abusing Mother. P.J. and Mother informed CPS that they had just been tucking J.L.W. tightly into bed so that he would not get up at night. The caseworker testified that he advised them that if there was a fire or something, J.L.W. "might not be able to get out, he could slip under the covers and suffocate, especially if they were tight enough to cause bruises on his body."

3

admitted that she left him with P.J. She stated that she knew that was a mistake: "I wasn't thinking about—I was—when I came to, I said, let me hurry up and get out of here, and I started thinking I should have turned back around and went and got my baby and took my baby with me." She left the apartment around 5:00 p.m., did not call P.J. because she "was scared that he would know where [she] was," and did not contact the police until noon the next day.

Officer Stahura returned with Mother to her apartment. Mother's aunt (hereinafter "Aunt") met them there to help Mother. P.J.'s sister had J.L.W. and brought him to the apartment. Officer Stahura stated:

> While I was talking to [P.J.'s sister], another vehicle drove up behind me and [P.J.] got out of the vehicle and ran into the apartment and went inside and locked the door. . . . I knocked on the door and I heard the voice of a young girl that was there—I believe it was [Mother's] daughter. . . . She unlocked the door. I ran into the apartment and ran to the back bedroom where I observed [P.J.] laying down on top of [Mother] on top of the bed, holding her arms and shaking her and screaming at her. . . .
>
> I believed it was a dangerous environment. I had to pull him off of her, and I grabbed him and pushed him against the wall and told him to calm down, and then, as I went to escort him out of the room, he tried pulling away from me and going back towards her, towards [Mother], and from there, I tried to take control of him. I tried to do an arm-bar take-down to take him down to the ground. It didn't work. We struggled for a little bit. If I remember, he pushed me, and I was eventually able to take him down on the ground and we struggled on the ground until I was able to take him in custody.

4

Officer Stahura testified that he talked with Mother after the assault and that she stated that she did not want to do anything about it. Officer Stahura testified that he arrested P.J. because he had witnessed the assault.

Mother and P.J. attempted to evade CPS after the assault, forcing the caseworker to turn the case over to a private investigation firm to locate the family. After Mother was located, CPS discovered that she had decided not to file for a restraining order against P.J. or to press charges for assault; her caseworker advised her that because of the domestic violence, P.J. needed to move out of the house for J.L.W.'s protection.[6] James Templeton, Mother's caseworker at the time, testified that Mother cooperated with CPS in placing J.L.W. with Aunt. Two of Mother's daughters, A. and B., have lived with Aunt since they were one and two years old respectively.

Templeton, a retired police officer, stated that his concern was that J.L.W. would not understand what was going on in a domestic violence situation and could very easily get hurt in an altercation between Mother and P.J. Subsequent caseworkers and Aunt testified that they had the same concerns. P.J. had also previously admitted to Templeton that he occasionally

---

[6] Mother's CPS caseworker noted that Mother's APS caseworker advised him that APS would not assist Mother with housing with P.J. living with her.

used marihuana; Templeton testified that this raised concerns about J.L.W. being left unsupervised with someone who was incapacitated.

Mother continued to live with P.J. Although CPS referred Mother to domestic violence counseling and individual therapy, Mother never went. One of her CPS caseworkers testified,

> I asked her if she had contacted MHMR and APS and continued those services. She said she had not. I asked her why. She said she didn't know; she just hadn't. And I asked her when the last time was when she saw [P.J.]. She paused, and then she said she still talks to him, she's going to continue to talk to him, and I informed her that due to the reason why [J.L.W.] came into care that that was not a good situation for [J.L.W.] to return to, and that as long as she was continuing to have that contact with [P.J.], I was not recommending that [J.L.W.] go back to her home, and I asked her if she would agree that [P.J.] would have no contact with [J.L.W.], and she agreed at the time that she would not allow [P.J.] to have any contact with [J.L.W.]

Mother resisted ending her relationship with P.J. In response to one caseworker's explanation that CPS could not return J.L.W. to her while P.J. lived with her, Mother stated that P.J. was her boyfriend and they were together and they were going to be together. She stated that all marriages had issues, all people fight, and that her situation with P.J. was something that was normal. Mother testified that she and P.J. planned to get married and that she wanted to stay with him and work the relationship out. She admitted that they had had physical fights in the past, but she stated that she had never given any

6

thought to leaving him at any point. She testified that she lost her housing in 2005 because P.J. was living with her.

Mother had four visits with J.L.W. before June 2007, but she only visited J.L.W. once between June 2007 and February 2008, after the visits were moved from the CPS office to Aunt's house. Mother testified that she did not visit him during that time because she did not want to go to Aunt's house and because she had to work. After June 2007 and prior to March 2008, Mother made no effort to visit J.L.W. or to work on her service plan, complaining that she had no transportation. When CPS performed a home visit in 2008, Mother did not have anything set up for J.L.W. The CPS caseworker testified as follows:

Q. Did you ask the mother about that?

A. I did.

Q. And what did she tell you?

A. She stated—I asked where was [J.L.W.] going to be sleeping. She showed me her bedroom, and she stated that she and [J.L.W.] would have the bed, and then I asked her, I said, well, where is [P.J.] going to sleep? And she stated to me [that] he would also be sleeping in the bed until they could get a toddler bed; she was trying to find a toddler bed, but she couldn't find one at this time, but until the toddler bed was purchased, the three of them would be sleeping in the bed together.

Q. Is that appropriate?

7

A.    No.

Q.    Did you talk to her about [P.J.] being around the child?

A.    I did.

Q.    And what did she tell you?

A.    She stated to me that [P.J.] loves her child, loves [J.L.W.],
      and would not hurt [J.L.W.].  I asked her, putting that aside,
      if something were to happen, and she said she would take
      [J.L.W.] to work with her and if she felt like she could
      protect [J.L.W.], if she needed to take him to work,[7] that's
      what she would have to do; otherwise, she was going to be
      there, and she felt like she could protect him.

The CPS caseworker testified that J.L.W. was doing really well living with Aunt, and she recommended that Mother's parental rights be terminated so that Aunt could adopt J.L.W.

Aunt testified that she and her husband want to adopt J.L.W.  She testified that she did not think that Mother had the ability to care for J.L.W. and that it would be dangerous for J.L.W. to be returned to Mother.  She testified that she had custody of two of Mother's other children, A. and B., "[b]ecause of Mother's poor choice of boyfriends."  She explained that A.'s father abused B. and beat her unconscious twice before B. was two years old, that A.'s father beat Mother, and that Mother was not able to protect B.  She stated, "To my

---

[7] Mother works at McDonald's two days per week.

8

knowing, all of [Mother's] boyfriends ha[ve] been abusive to her," and stated that this caused her concern for J.L.W.'s welfare.

Aunt also testified that she saw Mother hit B. with a comb when Mother was combing B.'s hair and B wouldn't sit still, "so [Mother] hit her in the head" with the comb. She testified that when A. and B. lived with Mother, Mother neglected them: "Dirty clothes, hair wasn't combed, and she would leave them there with this boy, with this man." Aunt stated that she had concerns about Mother leaving her children with various people.

Mother testified that if J.L.W. could not be returned to her, then she would want Aunt to take care of him.

The trial court terminated Mother's parental rights, finding by clear and convincing evidence that she knowingly placed or knowingly allowed J.L.W. to remain in conditions or surroundings that endangered the child's physical or emotional well-being; that she engaged in conduct or knowingly placed J.L.W. with persons who engaged in conduct that endangered the child's physical or emotional well-being; and that termination of Mother's parental rights to J.L.W. was in the child's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), (E), 161.001(2) (Vernon Supp. 2008). This appeal followed.

### III. Legal and Factual Sufficiency

9

In her first issue, Mother complains that the evidence is legally and factually insufficient to support the trial court's findings under subsections (D) and (E) of section 161.001(1) of the family code. In her second issue, she argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the child's best interest under section 161.001(2) of the family code.

## A. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of her child are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently — to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon Supp. 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We

10

strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth

of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the judgment. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

12

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) or (E) of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28.

**B. Endangerment Finding**

In her first issue, Mother claims that the evidence "does not show a pattern of violence and abuse involving [her], nor does it show other patterns of [her] conduct which would endanger the child's physical or emotional well-being, such as continuous drug abuse, homelessness, or emotional instability." Instead, she states that the evidence shows that prior CPS referrals regarding J.L.W. were unfounded and only one physical altercation occurred between her and her boyfriend, P.J.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D). Endangerment is defined as exposing to loss or injury,

13

to jeopardize. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied).

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child nor is the child required to suffer injury. *Boyd*, 727 S.W.2d at 533. Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Castorena v. Tex. Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, at *8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1992, writ denied) (op. on reh'g); *see also In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of living conditions, but also to the parent's conduct in the home).

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which

14

endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *D.T.*, 34 S.W.3d at 634. To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). The manner in which a parent treats other children in the family can also be considered in deciding whether that parent engaged in a course of conduct that endangered the physical or emotional well-being of a child. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.*, 96 S.W.3d at 256, *and C.H.*, 89 S.W.3d at 17.

15

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we may conduct a consolidated review. *In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that there was legally and factually sufficient evidence of both endangerment grounds when, among other things, the evidence showed that the mother exposed her children to domestic violence and refused to participate in her CPS service plan).

Mother relies on her own testimony that (1) her last physical altercation with P.J. occurred when J.L.W. was first removed from her and (2) that A.'s father never hit her to support her argument that the State failed to establish a pattern of abuse or violence that would result in endangerment to J.L.W.'s physical or emotional well-being.

Although Mother testified that P.J. had not abused her since CPS removed J.L.W. and that A.'s father never abused her, the trial court could have reasonably disbelieved this testimony based on Aunt's controverting testimony that all of Mother's boyfriends had abused her, including A.'s father; the evidence also showed J.L.W.'s father's conviction for assaulting Mother.

Other evidence at trial established a pattern of domestic abuse directed primarily at Mother, but also at her children, by Mother's boyfriends. It also

16

established that Mother was unable to recognize or acknowledge the danger to herself and her children or to take any sort of action to protect the children: she refused to press charges against P.J. for either assault in March 2007, she abandoned J.L.W. in the apartment with P.J. after the first attack, she attempted to hide J.L.W. from CPS after the assault, and she failed to attend domestic violence counseling. Instead, Mother testified that she planned to marry P.J. and that she had never given any thought to leaving him. And Aunt testified that Mother both failed to protect and also neglected her other children.

The CPS caseworkers involved with J.L.W.'s case testified that they were concerned that J.L.W., a delicate special needs child, could get hurt; Mother refused to acknowledge this danger other than to state that she would take J.L.W. to work with her if she needed to and that she felt like she could protect him. *See In re D.R.*, No. 02-06-00146-CV, 2007 WL 174351, at *1, 7 (Tex. App.—Fort Worth Jan. 25, 2007, no pet.) (mem. op.) (holding evidence of endangerment legally and factually sufficient with regard to mother suffering from severe mental retardation because "[t]he parent need not know that his or her own conduct is dangerous for a termination order pursuant to section 161.001(1)(E) to be proper").

17

Furthermore, Mother failed to make any efforts to perform her service plan until a month before the termination trial, and she did not visit J.L.W. for eight months, endangering his emotional well-being. *Cf. D.T.*, 34 S.W.3d at 640 (holding that the evidence of endangerment was not factually sufficient when mother contacted the State in order to ensure her child's safety and complied as fully as possible with the goals required to facilitate reunification with her child); *Clay v. Tex. Dep't of Human Res.*, 748 S.W.2d 598, 600–01 (Tex. App.—Waco 1988, no writ) (reversing termination on endangerment ground when mother testified she was getting a divorce from her abusive husband and would not go back to him, and she made regular visits, paid child support, and made every effort to comply with the court and DHS's requirements); *Doria v. Tex. Dep't of Human Res.*, 747 S.W.2d 953, 958–59 (Tex. App.—Corpus Christi 1988, no writ) (reversing termination where record indicated, among other factors, that "despite appellant's low intelligence, lack of skills, transportation problems and poverty[,]" she attended parental skill classes, worked two part-time jobs, substantially corrected the defects in the home, visited the children, and ended her relationship with her abusive boyfriend).

Reviewing all of the evidence in the light most favorable to the finding and judgment, and assuming that the trial court resolved any disputed facts in

favor of its finding if it could have reasonably done so, we hold that the trial court could have reasonably formed a firm belief or conviction that both Mother's conduct and her environment endangered J.L.W. *See J.P.B.*, 180 S.W.3d at 573. Therefore, we hold that the evidence is legally sufficient to support both of the trial court's endangerment findings. Likewise, giving due deference to the trial court as factfinder, we hold that the evidence is also factually sufficient to support both of the trial court's endangerment findings.[8] We overrule Mother's first issue.

## C. Best Interest Finding

Mother argues that although she continued a relationship with P.J. and although the evidence may show that J.L.W. would live a better life with the adoptive family, (1) the evidence presents no firm facts supporting the finding that termination is in J.L.W.'s best interest outside of her relationship with P.J., and (2) only scant evidence of each relevant *Holley* factor exists in this case.

---

[8] Mother argues that her case is distinguishable from *J.T.G.*, in which we upheld a termination on endangerment grounds when the mother testified that she had been abused by the fathers of her children and that during one of the altercations, one of the children had been hurt. *See* 121 S.W.3d at 126. She argues that we also relied on evidence of the mother's continued drug use, her emotional instability, and her suicidal tendencies to uphold the termination, and that, in contrast, none of this applies in her case. *See id.* at 126–27. However, the evidence here, while different from *J.T.G.*, would still allow the factfinder to reasonably form a firm belief or conviction that a pattern of endangering behavior in an endangering environment exists.

19

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: the desires of the child; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the

other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

We may also consider additional factors listed in section 263.307 of the family code. *See* Tex. Fam. Code Ann. § 263.307. Relevant factors here include the following: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with protection from repeated exposure to violence even though the violence may not be directed at the child. *See id.*

Mother testified that she was aware of her child's disability and would continue to provide him with proper services and schooling if he were returned to her; that P.J. loves J.L.W. and that she plans to continue her relationship with P.J.; that she had not been involved in any violence or abuse since J.L.W.'s removal; that she had obtained a stable living environment and stable employment; and that she had support through MHMR and APS to help with her disability and J.L.W.'s.

21

As a child with West Syndrome, J.L.W. has significant physical and mental disabilities and will continue to have them. Based on the testimony at trial by Aunt, Officer Stahura, and the CPS caseworkers, the trial court could have found that to return J.L.W. to Mother (and to P.J. according to Mother's testimony) would risk J.L.W's emotional and physical well-being because of the couple's past history of domestic abuse, Mother's individual history of abusive relationships, Mother's failure to protect her other children from the men with whom she had had abusive relationships, and Mother's inability to retain services or housing because of her continued relationship with P.J. Furthermore, the evidence at trial revealed that Mother has been unable to care for any of her four children, that Mother failed to attend domestic violence counseling, and that Mother's plan for J.L.W. was to share her bed, which she already shared with P.J., with J.L.W. until she could acquire a toddler bed for him.

In contrast, Aunt, already caretaker for two of Mother's four children, took J.L.W. into her home and sought to adopt him. The State's plan for J.L.W. was for Aunt to adopt him. When asked whether J.L.W. was bonded with Aunt and his other siblings in Aunt's home, the CPS caseworker replied:

> Yes, he is, and the reason that I say, when I first met [J.L.W.], he was at school, and I observed his play, and he does not at school interact with the other children too well. You know, he's not a

22

problem, but he's just a loner. He wants to be by himself. And I had observed that interaction for the longest, and when I finally had an opportunity to get out to [Aunt's] home and to see him respond to her, he smiles, he knows her, he goes to her, he knows that he has two sisters, he's very well-attached to the home, and has made great progress in the home.

Because of J.L.W.'s special needs, one of the CPS caseworkers testified that it was very important that Aunt be able to adopt J.L.W. so that J.L.W.'s Medicaid would continue. She testified, "because it takes so much to care for [J.L.W.], that he is going to need the subsidy and all that comes with that so that she can be able to continue to provide the excellent care and give the services in her home to provide for [J.L.W.]" Aunt receives no financial help at all with regard to Mother's other two children. When asked who she would want to take care of J.L.W. if he could not be returned to her, Mother replied, "[Aunt]."

Reviewing this and all of the other evidence presented at trial, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights to J.L.W. was in J.L.W.'s best interest. *H.R.M.,* 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's best interest findings. We overrule Mother's second issue.

## IV. Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, GARDNER, and WALKER, JJ.

DELIVERED: November 20, 2008